UTILITY SERVICE CORP., a corporation, Libellant,

v.

HILLMAN TRANSPORTATION COMPANY, a corporation, Respondent.

Harry ZUBIK, Libellant,

v.

HILLMAN TRANSPORTATION COMPANY, a corporation, Respondent.

Nos. 261, 262.

United States District Court
W. D. Pennsylvania.

July 19, 1956.

Harland I. Casteel, of Campbell, Houck & Thomas, Pittsburgh, Pa., for plaintiffs.

Clyde A. Armstrong, of Thorp, Reed & Armstrong, Pittsburgh, Pa., for respondent.

GOURLEY, Chief Judge.

These are actions in admiralty to recover for damages to marine equipment.

For purposes of brevity, the following abbreviations will be employed:

Harry Zubik ......"Zubik"
Hillman Transportation
 Company ......"Hillman"
Utility Service Corporation...."Utility"

Upon exhaustive non-jury trial, the following facts do not appear to be in dispute and/or are supported by the fair preponderance and weight of the credible evidence:

During the period including December 30, 1954, Utility was engaged in channel excavation in the vicinity of the Emsworth Pool of the Ohio River. In connection therewith, Zubik located a derrick boat and sand barge approximately 450 to 500 feet from the right downstream shoreline.

On the early morning of December 30, 1954, Hillman was operating the M/V Mary Lee Hillman downstream with a flotilla of six steel hopper barges. When the pilot of the M/V Mary Lee Hillman was approximately one-half mile above the location of the Zubik equipment, he observed the towboat Vulcan proceeding upstream with her tow approximately 500 feet below the Zubik and Utility equipment. He also observed the piers of the McKees Rocks bridge located in the Ohio River approximately 500 feet below the Zubik equipment, and that the water speed was five to six miles per hour.

The evidence developed that at a point approximately 2,000 feet above the Zubik equipment, the pilot of the M/V Mary Lee Hillman had the election of proceeding to the left of the Zubik equipment, in which area a strong cross-river current was flowing, or stopping his tow to await the passage of the towboat Vulcan.

Notwithstanding these conditions, the M/V Mary Lee Hillman proceeded downstream, and by reason of her inability to reduce her downstream speed, the starboard side of her tow collided with the Zubik and Utility marine equipment.

 Upon a most thorough review of the testimony and the exhibits, and the inferences to be drawn therefrom, it is my considered judgment that Hillman was guilty of negligence in attempting to pass to the left of the Zubik and Utility equipment in view of the cross-current and proximity of the equipment. Hillman's contention that its pilot was unaware of the extent of the cross-current is without merit. A pilot must be familiar with all dangers that are permanently located in the course of the river, as sand bars, snags, sunken rocks or trees, or abandoned vessels or barges. All this he must know and remember and avoid. To do this he must be constantly informed of changes in the current of the river, of sand bars newly made, of logs, or snags, or other objects newly presented, against which his vessel might be injured. Davidson Steamship Co. v. United States, 205 U.S. 187, 194, 27 S. Ct. 480, 51 L.Ed. 764.

In the course of trial a protracted dispute arose as to the proper assessment for the damages sustained.

 It is my judgment that Zubik is entitled to recover $13,951 and Utility $639.13.

The Court enters the following findings of fact and conclusions of law:

Findings of Fact

1. Utility Service Corporation, libellant in Admiralty Action No. 261, is a corporation organized and existing under the laws of the State of New York, and at all times herein material was authorized to transact business as a foreign corporation under the laws of the Commonwealth of Pennsylvania, maintaining a place of business at 1227 Shore Avenue, Pittsburgh 33, Pennsylvania.

2. Zubik, libellant in Admiralty Action No. 262, is an individual maintaining a principal place of business at 1227 Shore Avenue, Pittsburgh 33, Pennsylvania.

3. Hillman, respondent in Admiralty Actions Nos. 261 and 262, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, maintaining a principal place of business in the City of Pittsburgh, Allegheny County, Pennsylvania.

4. On December 30, 1954, Utility was engaged in the performance of a contract with Duquesne Light Company with respect to the excavation of a channel across the bed of the Ohio River at a point approximately 2.2 miles below the Point in the City of Pittsburgh, said channel connecting a point on Brunots Island, located on the left downstream side of the Ohio River, with a point on the right downstream side of the Ohio River near the foot of Island Avenue, North Side, City of Pittsburgh. The width of the Ohio River between said two points is approximately 900 feet.

5. On December 30, 1954, and at all other times herein material, Zubik was the owner of a steel hull, fully equipped derrick boat, an oil stern wheel towboat,

one steel hopper barge, one steel deck barge, each having dimensions of 100 feet in length, 26 feet in width, and 11 feet in depth, and one outboard motorboat, all of which marine equipment, including crew operators, was leased by Zubik to Utility on the following hourly and per diem basis, and employed by Utility in connection with the excavation of said river channel for the account of Duquesne Light Company:

| | |
|---|---|
| Derrick boat | $40.00 per hour |
| Tugboat | $13.00 per hour |
| Steel Deck barge | $20.00 per day |
| Steel Hopper barge | $20.00 per day |
| Outboard motorboat | $ 8.00 per day |

6. On December 30, 1954, and at all other times herein material, the Zubik derrick boat and sand barge were being operated at a point in said river channel being excavated by Utility for the account of Duquesne Light Company approximately 450 to 500 feet from the right downstream shoreline of the Ohio River and approximately 250 to 300 feet from the left downstream shoreline of the Ohio River, said derrick boat being anchored at said point on the downstream side and said sand barge being anchored in a diagonal direction with the Ohio River at the upstream side of said derrick boat.

7. The channel excavation was being performed by Utility for the account of Duquesne Light Company under a permit issued by United States Corps of Engineers to the Duquesne Light Company authorizing the same to be done.

8. At all times herein material the weather was clear and the visibility was good.

9. At all times herein material the Zubik derrick boat and sand barge and other equipment employed in the excavation of said river channel were properly lighted.

10. The normal Pittsburgh pool stage of 16½ feet, under ordinary conditions, is maintained by manipulation of the movable gates at the Emsworth Dam in the Ohio River below the City of Pittsburgh and below the point of accident. The Ohio River began to rise on December 28, 1954 and the Emsworth Dam was being opened in order to release the increased volumes of water flowing in the river. At 8:20 P. M. on December 29, 1954 the gates had been opened approximately 65%. These openings were gradually increased so that by 12:01 A. M., approximately fifteen minutes before the accident, they had been opened to 90%.

11. As the gates at the Emsworth Dam were opened, the flow or current of the river was increased accordingly so that at the time of the accident the channel current in the river was flowing at the rate of from five to six miles per hour. Under normal conditions, with the Dam not opened, the velocity of the current is approximately one-half mile to one and one-half miles per hour. The rise in the river and the opening of the gates not only increased the normal current in the channel of the river, but it also caused cross currents which normally are not present, and which cross currents were present in the vicinity of the Zubik equipment just prior to the accident.

12. On December 30, 1954, at or about 12:15 A. M., the M/V Mary Lee Hillman, a twin screw towboat powered by two diesel engines, each having a 625 h.p. rating, operated by and under the exclusive care, custody and control of Hillman, its agents, servants and employees, was propelling downstream on the Ohio River on her head a flotilla of six steel hopper barges, made up three wide and two long, each of said barges being 175 feet in length, 26 feet in width and 11 feet in depth, and each loaded with approximately 850 tons of bituminous coal. The combined dead weight tonnage of the M/V Mary Lee Hillman, her barges and cargo, was approximately 6,190 tons.

13. The Master of the M/V Mary Lee Hillman was a duly licensed pilot and had obtained a pilot's license approximately twenty-three years prior to December 30, 1954. Throughout the twenty-three year period as a pilot he had operated towboats on the Monongahela, Allegheny and Ohio Rivers and in and about the Emsworth Pool. He had piloted towboats

up and down the Emsworth Pool at a point in the Ohio River where the Zubik equipment was employed by Utility in said river channel operations approximately once every three days over a period of six months immediately preceding December 30, 1954, and was familiar with the location of said operations during said period and with the varied water conditions prevailing in the Emsworth Pool from time to time, and particularly water currents at and about the point where said channel operations were being conducted.

14. The Pilot of the M/V Mary Lee Hillman came on watch sometime prior to 12:15 A. M., on December 30, 1954, at or about .8 of a mile below the Point in Pittsburgh, and about 1.4 miles above the location of tthe Zubik equipment used and employed by Utility in connection with said channel excavations. Visibility was good and he was able to observe lights clearly at a distance of two miles. He observed that the water speed was approximately five to six miles per hour. Due to a bend in the river he was unable to observe the location of the Zubik equipment, which was properly lighted, until approximately one-half mile away. When at or about this point he also observed the towboat Vulcan and her tow of eleven empty steel hopper barges proceeding upstream at a point approximately 500 feet below the point where the Zubik equipment was anchored and was being operated by Utility in connection with its channel operations. The towboat Vulvan blew one long blast, being the recognized signal for a port to port passage. Immediately thereafter the Pilot of the M/V Mary Lee Hillman blew four short blasts which voided the passing signal of the towboat Vulcan and immediately thereafter blew two long blasts indicating a desire of the M/V Mary Lee Hillman to effect a starboard passage.

15. Towboats proceeding downstream have the right of way over towboats proceeding upstream and by reason thereof towboats proceeding upstream must give way with respect to the passage desire of towboats proceeding downstream.

16. When the Pilot of the M/V Mary Lee Hillman was approximately one-half mile above the location of the Zubik equipment, he observed the towboat Vulcan proceeding upstream with her tow approximately 500 feet below the Zubik equipment. He also observed the piers of the McKees Rocks Bridge located in the Ohio River approximately 500 feet below the Zubik equipment, and also that the water speed was five to six miles per hour, all of which caused him to realize that he was in danger and the existence of the possibilities of a collision.

17. Notwithstanding this realization, he proceeded downstream to a point approximately 2,000 feet above the location of the Zubik equipment, at which time a starboard passage was effected with the towboat Vulcan, which elected passage on his part necessitated the M/V Mary Lee Hillman to pass to the left of the Zubik equipment and the right downstream shore of Brunots Island, in which area a strong cross-river current was flowing from the easterly head of Brunots Island to the north downstream shore of the Ohio River. At this point the Pilot of the M/V Mary Lee Hillman had the election of proceeding to the left of the Zubik equipment against a cross-current or stopping his tow to await the passage of the towboat Vulcan, and thereafter proceed with safety to the right of the Zubik equipment and along the right downstream shoreline of the Ohio River. The Pilot of the M/V Mary Lee Hillman knew that under the circumstances and conditions then prevailing he was unable to bring his tow to a stop in a distance less than 1,500 feet. The Pilot of the M/V Mary Lee Hillman, notwithstanding this knowledge and the circumstances and conditions then prevailing, proceeded downstream to a point approximately 1,000 feet above the Zubik equipment when he for the first time reversed his engines full astern.

18. By reason of the inability of the M/V Mary Lee Hillman to kill her downstream speed and come to a stop within a distance of 1,000 feet, the starboard side of her tow collided with the Zubik sand

barge, which in turn rammed the Zubik derrick boat anchored alongside, and shoved the same from the position where anchored a distance of approximately 100 feet.

19. The Pilot of the M/V Mary Lee Hillman exercised bad navigation judgment in attempting to pass to the left of the Zubik equipment under all the circumstances and conditions then and there prevailing.

20. As a result of said collision the Zubik equipment sustained the following damages:

Damage to side of sand barge

Damage to hull of derrick boat

2 Broken spuds of derrick boat

Damage to boom on derrick boat

Damage to stiff leg on derrick boat

21. As a result of said collision, evaluating expert testimony for cost of labor and replacement of damaged parts together with loss of time during which said equipment was put out of use, Zubik sustained damages in the amount of $13,951.

22. As a result of the said collision, Utility sustained damages in the amount of $894.44 as established by the record. This damage item included cost of shot casing in the amount of $465.18. Subsequent to the closing of the record it was determined that the amount of shot casing purchased by Utility amounted to $209.87 for which Utility was not reimbursed, and that the remainder of the shot casing was taken from inventory for which Utility was previously compensated by the Duquesne Light Company, thereby reducing the shot casing item from $465.18 to $209.87, and reducing the total damage claim of Utility from $894.44 to $639.13.

Conclusions of Law

1. This Court has jurisdiction over the parties and the causes of action in admiralty.

2. The sole and proximate cause of the collision between the M/V Mary Lee Hillman and her tow and the marine equipment of Zubik and Utility and the damages arising therefrom was the negligent navigation of the M/V Mary Lee Hillman and her tow in failing to bring her to a stop when one-half mile away from the location of the marine equipment of Zubik and Utility, at which time the Master in charge knew under all the circumstances and conditions then prevailing that a collision was imminent and knew the inability of the M/V Mary Lee Hillman to bring her tow to a stop within a distance of less than 1,500 feet, and thereafter proceeding to a point approximately 1,000 feet from the marine equipment of Zubik and Utility, at which time the engines of the M/V Mary Lee Hillman were first reversed full astern.

3. Zubik in no way contributed to the collision.

4. Utility in no way contributed to the collision.

5. In connection with Admiralty Action No. 261 Utility is entitled to recover from Hillman damages in the sum of $639.13, with interest thereon from December 30, 1954.

6. In connection with Admiralty Action No. 262 Zubik is entitled to recover from Hillman damages in the amount of $13,951 with interest thereon from December 30, 1954.

An appropriate order is entered.